T.C. Memo. 1996-443


UNITED STATES TAX COURT


NORSTAM VENEERS, INC., A KENTUCKY CORPORATION, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

NORSTAM VENEERS, INC., Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 27615-92, 608-93.      Filed September 26, 1996.


Donald E. Meyer, for petitioner.

William C. Shouse, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

FOLEY, Judge:  By notice dated September 21, 1992, respondent determined a deficiency in petitioner's 1989 Federal income tax of $26,829.  By notice dated December 21, 1992, respondent determined deficiencies in petitioner's 1990 and 1991

Federal income tax of $27,844 and $31,888, respectively. These cases (docket No. 27615-92 for 1988 and docket No. 608-93 for 1990 and 1991) have been consolidated for purposes of trial, briefing, and opinion pursuant to Rule 141(a).

The sole issue for decision is whether petitioner is entitled to credits against income taxes pursuant to section 29 for selling a qualified fuel to an unrelated person. We hold that petitioner is not entitled to such credits.

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The Stipulations of Facts are incorporated by this reference. Petitioner is a Kentucky corporation whose principal place of business was in Mauckport, Indiana, at the time the petitions in these cases were filed.

## I. The Veneer-Production Process

Petitioner is a wood veneer and lumber company incorporated in 1971. From 1971-1979, petitioner took its logs to an unrelated veneer mill, which converted them into veneer for a fee. Petitioner then sold the veneer to its customers. In 1979, petitioner purchased a wood-burning system that consisted of a

gasifier and an attached boiler.  The system produced steam used in the veneer-production process.

A gasifier is a device in which heat and air are used to produce gas from wood scrap.  Petitioner's gasifier operates on a mixture of sawdust, shredded veneer scrap, and bark salvaged from petitioner's production process.  The mixture is fed into the gasifier via an augur feeder from a silo on site.  As the mixture falls into the gasifier, it enters a large fire chamber.  The mixture spills down onto a series of cast-iron, perforated grates arranged like a set of steps, where it is heated until it undergoes a process known as pyrolysis (wherein combustible gas is released from the mixture and ignited).  The burning gas increases in temperature as it combines with air pulled through the system by an induced draft fan.  The gas is drawn through a 30-foot long fire chamber lined with refractory, where the combustion process is completed.  When the superheated gas exits the fire chamber, it is drawn back through tubes immersed in the water chamber of the boiler.  The gas enters the tubes at a temperature near 2,000 degrees Fahrenheit and heats the surrounding water in the boiler, resulting in the release of steam.  The steam is then piped to the veneer mill where it is used to heat water in veneer vats used to cook wood logs and in radiators used to dry veneer.

In the production of domestic veneer, a log is split and cooked in a veneer vat containing water heated by steam from

petitioner's boiler. The cooked wood is sliced while warm by a veneer slicer. The sliced sheets of veneer are placed on a conveyor belt that goes through a veneer dryer. Depending on the type of wood, the veneer dryer reduces the moisture content of the sheets from as high as 70 percent to approximately 10 percent within 1 or 2 minutes. The veneer dryer contains fin radiators, which are also heated with steam piped into the plant from petitioner's boiler. Air is blown across the fin radiators and used to dry the veneer. After drying, the veneer is crated for sale and shipment.

II. Agreement Between Petitioner and Washington Trade Co.

On September 20, 1988, petitioner and the Washington Trade Co. (WTC), an unrelated party, entered into a 1-year written contract (the Agreement). The stated purpose of the Agreement was to allow WTC to furnish and install specified veneer-processing equipment (the WTC Equipment) at petitioner's mill and to train some of petitioner's employees in the production methods preferred by WTC. Petitioner was to use the WTC Equipment to produce veneer to WTC's specifications, furnishing the requisite personnel and incidentals, including utilities and insurance coverage. WTC's process required the cooking of whole logs, the use of WTC's dryer, and the cutting of the veneer to a thickness greater than that generally used in the United States.

Paragraph 4 of the Agreement is captioned "Testing". It provided that WTC could conduct tests at petitioner's mill to

ensure that petitioner's support systems and ancillary equipment were of sufficient capacity to permit safe and efficient utilization of the WTC Equipment. Petitioner agreed to provide the necessary "systems and utilities at such capacities to the [WTC] Equipment hook up at Norstam's cost". The Agreement contains no other mention of utilities and no mention of gas or steam.

Paragraph 10 of the Agreement is captioned "Fixed Payment". Subparagraph (a) provided that WTC was to make a monthly payment to petitioner "for the use of the area designated as Area B in Exhibit A". Exhibit A of the Agreement was a diagram of the area in which the WTC Equipment was to be installed. The Agreement stated that WTC was to pay petitioner $1,368 per month for the use of "Area B". There is no reference to utilities, gas, or steam in paragraph 10.

The Agreement provided that the WTC Equipment was to include one or two lathes, a roller dryer, and clippers and was to remain the property of WTC. Steam necessary to operate the WTC Equipment was piped over from petitioner's boiler. WTC paid the costs to deliver and install the WTC Equipment, including electrical, mechanical, and plumbing alterations to "Area B".

Petitioner was to crate the finished veneer and hold it for shipment as directed by WTC. Petitioner agreed to do work for WTC on each normal operating day and to produce as much veneer as WTC required, which was to be a minimum of 1,200 board feet per

operating day. WTC agreed to pay petitioner for finished veneer at a specified rate per board foot depending on the type of wood used. Petitioner was to bill WTC weekly for finished veneer, and the rates were subject to adjustment if the price of logs changed substantially. Upon termination of the Agreement, WTC was to remove the WTC Equipment at its expense and restore petitioner's plant to its original condition.

The Agreement required petitioner to assign at least six employees to WTC-related work: One to process logs in the vats and clean the logs; one to saw and transport the logs to lathes; two to remove veneer from the lathes; one to place veneer in the dryer; and one to remove veneer from the dryer. The Agreement provided that these individuals were to remain petitioner's employees at all times. Petitioner was also required to provide any incidental manpower necessary to produce at least 1,200 board feet per day. The costs of any personnel necessary to produce more than that amount were to be reimbursed by WTC at an hourly rate established in advance. At times during the term of the Agreement, petitioner provided as many as 20 employees to perform WTC-related work.

The Agreement was extended 1 year by letter dated September 7, 1989, and 1 additional year by letter dated October 23, 1990. The letters made certain price and term adjustments not relevant to this case. No further extensions were executed, and the relationship between petitioner and WTC

terminated on September 20, 1991, upon expiration of the second extension.

OPINION

Section 29(a) allows a tax credit for qualified fuels produced by a taxpayer and sold to an unrelated person. Section 29 includes "biomass" within its definition of "qualified fuels". For petitioner's 1989 and 1990 tax years, biomass was defined as "any organic material which is an alternate substance (as defined in section 48(l)(3)(B)) other than coal (including lignite) or any product of such coal." Sec. 29(c)(3). For petitioner's 1991 tax year, biomass was defined as "any organic material other than (A) oil and natural gas (or any product thereof), and (B) coal (including lignite) or any product thereof." Sec. 29(c)(3).

Petitioner bears the burden of proving its entitlement to the credits. See Rule 142(a); New Colonial Ice Co. v. Helvering, 292 U.S. 435, 400 (1934). For the reasons discussed below, we conclude that petitioner did not sell its qualified fuel and thus is not entitled to the credits.

Petitioner contends that WTC leased "Area B" from petitioner and that petitioner provided utilities to WTC as part of the lease. Accordingly, petitioner contends that it "sold" biomass to WTC, because petitioner "took on the role of a Utility Company". Petitioner bases its contention on paragraph 10 of the Agreement, which stated that WTC was to make a monthly payment of

$1,368 to petitioner for the use of "Area B", and on paragraph 4 of the Agreement, which stated that petitioner was to furnish "such systems and utilities" as required to accommodate the safe and efficient use of the WTC Equipment.

Petitioner made a similar argument in United States v. Norstam Veneers, Inc., 95-1 USTC (CCH) par. 50,034, 75 AFTR2d 95-591 (S.D. Ind. 1994). In that case, petitioner litigated its entitlement to section 29 credits for its 1987 and 1988 tax years (i.e., tax years preceding its Agreement with WTC) and contended that, because biomass was an integral part of the process by which veneer was produced, the biomass had become part of the product and was thereby "sold" to an unrelated person.

The District Court rejected Norstam's argument. The court noted that section 29 required a sale of a qualified fuel--not merely of products produced through the use of a qualified fuel. The court stated that Norstam's position confused process with product. "Using Norstam's logic," the court wrote, "we could similarly argue that Indiana corn, if eaten by Norstam workers, powered the muscles which helped produce the veneer, and thus is also part of Norstam's product." Id.

Petitioner's argument in the present case is equally unpersuasive. Petitioner's position is undermined by the express terms of the Agreement. The Agreement contains no indication that part of WTC's "fixed payment" to petitioner was intended to pay for the purchase of biomass. Indeed, the Agreement provided

that petitioner was required to furnish utilities to WTC "at [petitioner's] cost."  This provision flatly contradicts petitioner's assertion that WTC purchased biomass from petitioner in exchange for the "fixed payment".

Accordingly, we hold that petitioner has failed to meet its burden of proving that it sold a qualified fuel to an unrelated person pursuant to section 29.

To reflect the foregoing,

Decisions will be entered for respondent.